IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | |
|---|---|
| KATHERINE GRUNDMANN GRUNDY,<br>9115 McDonald Drive<br>Bethesda, MD 20817,<br><br> *Plaintiff*,<br><br> v.<br><br>UNIVERISTY OF MARYLAND SCHOOL OF MEDICINE,<br>655 W. Baltimore Street<br>Baltimore, MD 21201,<br><br> Serve:<br> Hon. Brian E. Frosh<br> 200 St. Paul Place<br> Baltimore, Maryland 21202,<br><br><br>UNIVERISTY OF MARYLAND, BALTIMORE,<br>620 W. Lexington St.<br>Baltimore, MD 21201,<br><br> Serve:<br> Hon. Brian E. Frosh<br> 200 St. Paul Place<br> Baltimore, Maryland 21202,<br><br><br>THE BOARD OF REGENTS OF THE<br>UNIVERSITY SYSTEM OF MARYLAND,<br>3300 Metzerott Road<br>Adelphi, MD 20783,<br><br> Serve:<br> Hon. Brian E. Frosh<br> 200 St. Paul Place<br> Baltimore, Maryland 21202,<br><br> *Defendants*. | Case No.:_____ |

1

# CIVIL COMPLAINT FOR EQUITABLE
# AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Katherine Grundmann Grundy M.D. brings this civil complaint alleging unlawful discrimination and retaliation against the University of Maryland School of Medicine, University of Maryland, Baltimore, and the Board of Regents of the University System of Maryland (collectively "Defendants") for violating the Rehabilitation Act of 1973.

## PARTIES

1. Plaintiff Dr. Grundy is a United States citizen domiciled in Maryland, and she worked for the University of Maryland in Baltimore, Maryland.

2. Defendant the University of Maryland School of Medicine is the medical school of the University of Maryland located in Baltimore, MD.

3. Defendant the University of Maryland, Baltimore is a public university located in Baltimore, MD.

4. The Board of Regents of the University System of Maryland is the governing body over the University System of Maryland, including the University of Maryland Medical School.

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. § 1331 because Dr. Grundy's federal discrimination and retaliation claims arises under the Rehabilitation Act of 1973.

6. This Court has personal jurisdiction over Defendants because they maintain headquarters in this District.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the decision to terminate Dr. Grundy's employment occurred within this District.

**FACTUAL ALLEGATIONS**

8. Dr. Grundy began her career at the University of Maryland Medical System in 1996. After graduating medical school at SUNY Stony Brook, Dr. Grundy completed her residency at the University of Maryland Medical System from 1996 through 1999.

9. After completing her residency, Dr. Grundy transitioned to an attending emergency medicine physician with the University of Maryland School of Medicine where Dr. Grundy worked from 1999 until present day.

10. Dr. Grundy's current title is Clinical Assistant Professor with the University of Maryland School of Medicine. Dr. Grundy works at a clinical site as a clinical professor, specifically the Baltimore VA Medical Center. Dr. Grundy's primary research deals with geriatrics and ophthalmology.

11. Dr. Grundy's hours fluctuated throughout her twenty-one-year career; however, Dr. Grundy always remained a full-time employee. Full-time employment as a clinical professor at the University requires professors to complete 1,400 clinical hours each year, and an employee is considered a part-time employee if a clinical professor's hours dip below fifty-one percent.

12. As a mother of four children, Dr. Grundy's hours fluctuated over the years depending on her children's schedules. Dr. Grundy worked between fifty-one and seventy-five percent capacity. Yet, Dr. Grundy worked in recent years at seventy-five percent capacity or 1,050 clinical hours. The University accepted and approved this schedule and never indicated any issues with Dr. Grundy's fluctuating schedule.

13. In or around January 2020, Dr. Grundy discovered and applied for a Medical Director position with PinnacleCare, which is a medical consulting advisory firm. Dr. Grundy

interviewed with PinnacleCare and received an offer for this position on or about January 28, 2020.  PinnacleCare asked Dr. Grundy to start on or about May 3, 2020.

14. Dr. Grundy informed her immediate supervisor, Dr. David Jerrard, about PinnacleCare's offer and inquired whether the University would allow her to continue working at fifty-one percent capacity. Dr Jerrard was aware of the functions at Pinnacle care as he had spoken to the company and given a reference.  Dr. Grundy requested that she complete her shifts primarily on weekends, which were the least desirable clinical schedules, and Dr. Jerrard stated that he did not believe such an arrangement would pose on issue and directed Dr. Grundy to speak with Dr. Brian Browne, Professor and Chair of the Emergency Medicine Department.  As Department Chair, Dr. Browne maintained final authority on Dr. Grundy's schedule.

15. On or about February 17, 2020, Dr. Grundy met with Dr. Browne to discuss her proposed schedule, specifically that Dr. Grundy would continue working at the University as a clinical professor while reducing her schedule from seventy-five percent to fifty-one percent clinical capacity, primarily on the weekends, while also working for PinnacleCare Monday through Friday.  Dr. Browne stated that this schedule would be agreeable, and Dr. Grundy accepted PinnacleCare's offer expecting to start on or about May 3, 2020.

16. On or about February 29, 2020, the University announced the sudden removal of Dr. Jerrard's position from the Baltimore VA Medical Center.  The announcement also noted that Dr. Jon Mark Hirshon would replace Dr. Jerrard as Dr. Grundy's immediate supervisor. Dr. Jerrard remained with the University.

17. Dr. Grundy met with Dr. Hirshon several days later to discuss her schedule and agreements with Drs. Jerrard and Browne.  Dr. Hirshon stated that he would look into the matter.  However, the final decision regarding Dr. Grundy's schedule remained with Dr. Browne.

18. Dr. Grundy took a prescheduled family vacation from March 8, 2020, through March 16, 2020.

19. In early 2020, the United States experienced an outbreak of the coronavirus disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), colloquially known as COVID-19.  Originating in Wuhan, China in or around December 2019, the World Health Organization (WHO) first designated a public health emergency on or about January 30, 2020.  The WHO later declared COVID-19 a worldwide pandemic on or about March 11, 2020.

20. The United States identified its first COVID-19 case on or about January 20, 2020.  President Donald Trump subsequently declared a public health emergency on or about January 31, 2020.  President Trump later declared a national emergency on or about March 13, 2020.  The United States implemented travel restrictions, and states across the country followed suit, implementing varying degrees of restrictions and stay at home orders.

21. In or around early March 2020, Maryland reported its first community spread of COVID-19.  On or about March 12, 2020, Governor Larry Hogan raised the Maryland Emergency Management Agency activation level to high and announced sweeping measures to prevent COVID-19 community spread, including closing Maryland's schools to any in-person instruction, including the University of Maryland, prohibitions on mass gatherings, and issuing a stay-at-home order.

22. The United States Centers for Disease Control and Prevention (CDC) and the WHO issued guidance that certain people are at higher risk for severe illness from COVID-19.  This includes people aged sixty-five and older, people in nursing homes or long-term care facilities, and those with underlying medical conditions, particularly those with any respiratory or heart conditions.

23. On or about March 16, 2020, the University of Maryland issued a statement regarding staff remaining on campus during current telework period. In pertinent part, this statement read as follows:

> The safety and wellness of students, faculty, and staff are paramount as the University System of Maryland (USM) develops protocols in response to the coronavirus outbreak. Our institutions currently remain open under USM telework guidance and they are transitioning students to remote and online learning following spring break. They are also supporting students who will need housing, as well as faculty who need additional resources to transition classes to remote formats.
>
> No staff member who is immuno-compromised or otherwise considered by CDC guidance to be high-risk regarding COVID-19 will be required to work on campus. Faculty and staff over the age of 60, or those with CDC-recognized underlying conditions, can contact their human resources office on a confidential basis and arrange telework, use accrued sick or other leave, or receive an excused absence.

24. Shortly thereafter, the University of Maryland Medical System issued a separate policy on COVID-19 and High-risk Clinical Providers and Direct Patient Care Guidelines. In pertinent part, this policy stated the following:

> The Department of Emergency Medicine (the Department) is committed to providing a safe and healthy workplace for all employees, patients, and facility visitors. In order to accomplish this commitment, the Department must effectively plan for its operational needs under the unusual circumstances presented by the COVID-19 pandemic. Recently the University of Maryland System (USM) released the following statement: "[N]o employee (faculty or staff) who is immuno-compromised or otherwise considered by CDC guidance to be high-risk regarding COVID-19 will be required to work on campus. Faculty… over the age of 60, or those with CDC-recognized underlying conditions, can contact their Human Resources Office on a confidential basis and arrange telework or use accrued sick or other leave… Employees unable to telework for COVID-19 related reasons such as this are eligible to use their sick leave and other accrued leave."
>
> Any faculty member who falls within a high-risk group as defined by the CDC and who desires a reasonable accommodation should contact Ms. Shondrea Williams, Human Resources Manager/Office Manager, who

> oversees human resources for the Department. Ms. Williams is equipped to direct faculty members to the required forms and process as well as to direct faculty members to the appropriate contact within the University Maryland, Baltimore Human Resource Services Office to process the request. Notifying her first of your request will help the department more effectively address its operational needs. Note: this process does not require disclosing personal information about the reasons for the request directly to Ms. Williams.  Faculty who request an accommodation will be placed on immediate sick leave until a determination is made by the University. Otherwise, all faculty are expected to work all scheduled shifts.

25. When Dr. Grundy returned from her vacation on March 17, 2020, her clinical site, the Baltimore VA Medical Center, had erected a COVID-19 testing site outside the Medical Center.

26. Dr. Grundy returned from her vacation with a mild cough, which could be a COVID-19 symptom, and so the VA Medical Center sent Dr. Grundy home to quarantine herself for two weeks.

27. Dr. Grundy suffers from asthma and eczema, which make Dr. Grundy a high-risk patient for severe illness should she contract COVID-19.  Dr. Grundy started worrying about contracting COVID-19 as she is at higher risk for severe illness should she contract COVID-19, and she started seeing a psychologist regarding anxiety from her increased risk.

28. On or about March 23, 2020, Dr. Grundy's primary care physician wrote a letter to her employer stating that Dr. Grundy's eczema and asthma made her a high-risk patient for COVID-19 complications.  This letter explained that "Dr. Grundmann Grundy is under my medical care for chronic conditions including asthma and eczema.  She would be at high risk for complications if she were to be infected with the Covid-19 virus.  It is my recommendation that she not have direct patient care during current outbreak."  Dr. Grundy provided her physician's letter to the University on or about March 27, 2020, thus requesting a reasonable accommodation

under the Rehab Act to Ms. Shondrea Williams, Human Resources Manager/Office Manager, that she be allowed to telework because she is at high-risk for COVID-19.

29. In or around mid to late March of 2020, Dr. Grundy had a breakdown over the phone with Dr. Hirshon regarding her anxiety over contracting COVID-19 and the potential harm it could have given her underlying medical conditions.

30. After struggling with her anxiety over contracting COVID-19, and consulting with both Dr. Jerrard and her psychologist, Dr. Grundy called Dr. Browne on April 20, 2020 to discuss and disclose her high risk status and the acute anxiety it caused her. During the phone call with Dr. Browne, Dr. Grundy stated that she was seeking treatment with the plan to be able to return. Dr. Browne commented to Dr. Grundy that COVID-19 was here to stay.

31. Less than an hour after her phone call on April 20, 2020 with Dr. Browne, Dr. Browne called Dr. Grundy back to inform Dr. Grundy that the University would not renew her contract for another term.

32. That same day, at 3:48 pm on April 20, 2020, Dr. Grundy received an email from Ms. Williams with information for submitting an ADA accommodation request.

33. Shortly after receiving Ms. William's email with ADA accommodation paperwork, at 5:02 pm on April 20, 2020, Dr. Browne provided Dr. Grundy with a letter declaring that Dr. Grundy's appointment as Clinical Assistant Professor, part-time, non-tenure track, in the Department of Emergency would not be renewed for another term and that Dr. Grundy's tenure at the University would expire June 30, 2020.

34. In her twenty-one-year career at the University, Dr. Grundy's appointment has always been renewed without question.

35. As the result of Defendants' discrimination and retaliation, Dr. Grundy has sustained mental anguish and economic damages, and she will continue to sustain damages into the foreseeable future.

**COUNT I**
**Discrimination**
**Rehabilitation Act, 29 U.S.C. § 794, *et seq.***
**Against All Defendants**

36. Dr. Grundy incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

37. Dr. Grundy is an "employee" as defined by the Rehabilitation Act.

38. Defendants are an "employer" as defined by the Rehabilitation Act, 29 U.S.C. § 794(b)(2)(A) because they are part of a public university receiving federal financial assistance from the United States.

39. Dr. Grundy has a disability within the meaning of the Rehabilitation Act because she is diagnosed with asthma and acute anxiety, which substantially impair her ability to perform some functions of her position.

40. Defendants had knowledge of this disability, as Dr. Grundy repeatedly informed Defendants of her disability and the subsequent limitations her disability placed upon her.

41. Dr. Grundy can perform the essential functions of her position with a reasonable accommodation.

42. Dr. Grundy continues to meet the legitimate expectations placed upon her by Defendants.

43. Defendants took an adverse action against Dr. Grundy when they refused to engage with Dr. Grundy regarding a proper accommodation for her disability.

44. Defendants took an adverse action against Dr. Grundy on April 20, 2020 when they informed Dr. Grundy that her appointment as Clinical Assistant Professor would not be renewed for another term.

45. Defendants simultaneously allowed other employees to telework as Dr. Grundy requested. Dr Grundy signed for multiple telework shifts, but each shift was cancelled by the University.

46. Dr. Grundy's requested accommodation for her disability, to telework during the COVID-19 pandemic, was reasonable because it was consistent with the policies Defendants promulgated when they stated that all persons at higher risk of COVID-19 complications would not be required to be physically present on campus and could request an accommodation to telework.

47. Any reasons proffered by Defendants for the adverse actions taken against Dr. Grundy are mere pretext for its discriminatory and retaliatory actions.

48. The Rehabilitation Act entitles Dr. Grundy to such legal or equitable relief as will effectuate the Rehabilitation Act's purpose, including but not limited to economic and compensatory damages, and reasonable costs and attorneys' fees.

**COUNT II**
**Rehabilitation Act – Failure to Accommodate**
**29 U.S.C. § 794, *et seq*.**
**Against All Defendants**

49. Dr. Grundy incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

50. Dr. Grundy is an "employee" as defined by the Rehabilitation Act.

51. Defendants are an "employer" as defined by the Rehabilitation Act, 29 U.S.C. § 794(b)(2)(A) because they are part of a public university receiving federal financial assistance from the United States.

52. Dr. Grundy has a disability within the meaning of the Rehabilitation Act because she is diagnosed with asthma and acute anxiety which substantially impair her ability to perform some functions of her position.

53. Defendants have knowledge of this disability, as Dr. Grundy repeatedly informed Defendants of her disability and the subsequent limitations her disability placed upon her.

54. Dr. Grundy can perform the essential functions of her position with a reasonable accommodation.

55. Dr. Grundy continues to meet the legitimate expectations placed upon her by Defendants.

56. Dr. Grundy sought a reasonable accommodation from Defendants when she requested on March 27, 2020 that she be allowed to telework during the COVID-19 pandemic, consistent with Defendants' COVID-19 policies.

57. Dr. Grundy has continued to seek these accommodations through the present.

58. Defendants refused to engage with Dr. Grundy regarding a proper accommodation for her disability, thus failing to participate in an interactive process in good faith in order to identify a suitable accommodation.

59. To date, Defendants have failed to provide Dr. Grundy with a reasonable accommodation.

60. Defendants simultaneously allowed other employees to telework as Dr. Grundy requested.

61. Dr. Grundy's requested accommodation for her disability, to telework during the COVID-19 pandemic, was reasonable because it was consistent with the policies Defendants promulgated when they stated that all persons at higher risk of COVID-19 complications would not be required to be physically present on campus and could request an accommodation to telework.

62. Any reasons proffered by Defendants for the adverse actions taken against Dr. Grundy are mere pretext for their discriminatory and retaliatory actions.

63. The Rehabilitation Act entitles Dr. Grundy to such legal or equitable relief as will effectuate the Rehabilitation Act's purpose, including but not limited to economic and compensatory damages, and reasonable costs and attorneys' fees.

**COUNT III**
**Rehabilitation Act – Retaliation**
**29 U.S.C. § 794, *et seq*.**
**Against All Defendants**

64. Dr. Grundy incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

65. Dr. Grundy is an "employee" as defined by the Rehabilitation Act.

66. Defendants are an "employer" as defined by the Rehabilitation Act, 29 U.S.C. § 794(b)(2)(A) because they are all part of a public university receiving federal financial assistance from the United States.

67. Dr. Grundy engaged in protected activity under the Rehabilitation Act when she informed Defendants that she had a disability, asthma, and required a reasonable accommodation.

68. Defendants took an adverse action against Dr. Grundy when they refused to engage with Dr. Grundy regarding a proper accommodation for her disability.

69. Defendants took an adverse action against Dr. Grundy on April 20, 2020 when they retaliated against Dr. Grundy by informing Dr. Grundy that her appointment as Clinical Assistant Professor would not be renewed for another term.

70. Defendants took these actions in temporal proximity to Dr. Grundy's protected activity under the Rehabilitation Act.

71. Any reasons proffered by Defendants for the adverse actions taken against Dr. Grundy are mere pretext for their discriminatory and retaliatory actions.

72. The Rehabilitation Act entitles Dr. Grundy to such legal or equitable relief as will effectuate the Rehabilitation Act's purpose, including but not limited to economic and compensatory damages, and reasonable costs and attorneys' fees.

**PRAYER FOR RELIEF**

Based on the foregoing, Dr. Grundy respectfully requests that the Court enter judgment in his favor and award to her the following relief:

a. Economic damages, back pay and front pay;

b. Liquidated damages;

c. Attorney's fees and costs;

d. Pre-judgment interest;

e. Injunctive relief;

f. Other equitable relief; and

g. Any other relief that this Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Dr. Grundy demands a trial by jury for any and all issues proper to be so tried.

          Respectfully submitted,

          */s/ Kellee Boulais Kruse*
          R. Scott Oswald
          Kellee Boulais Kruse
          THE EMPLOYMENT LAW GROUP, P.C.
          888 17th Street, N.W., Suite 900
          Washington, D.C. 20006
          (202) 261-2838
          (202) 261-2835 (facsimile)
          soswald@employmentlawgroup.com
          kkruse@employmentlawgroup.com
          *Counsel for Plaintiff*